**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**MODERN STORAGE, LLC** **PLAINTIFF**

**v.** **No. 4:23-cv-1199-DPM**

**STORE LOCAL MEDIA CORPORATION, d/b/a Modern Storage Media** **DEFENDANT**

# ORDER

Americans seem to hang on to their stuff. Self-storage units help many do so. Modern Storage, LLC rents particularly modern storage units in Arkansas. The company hopes to expand by franchising. Store Local Media—d/b/a Modern Storage Media—publishes a magazine, almanac, and digital media for the American and Canadian self-storage industry. The name overlap signals the problem. Modern Storage has sued Store Local Media, making various intellectual property claims under federal law and Arkansas law. Some time ago, Modern Storage moved for summary judgment on all its claims and several of Store Local Media's affirmative defenses. *Doc. 56, 59, 62, 65, 68, & 71.* Store Local Media also sought summary judgment. *Doc. 74.* The Court partly granted and partly denied the parties' many motions, *Doc. 137.* The Court then held an extended, and helpful, oral argument on the remaining claims—trademark infringement and unfair competition.

The Court appreciates Modern Storage and Store Local Media's focused post-hearing briefs, *Doc. 145 & 146*. Those remaining claims present the deep issue: Are consumers likely to be confused about the source or affiliation of the Modern Storage Media self-storage publications?

*

The Lanham Act protects against trademark infringement. It imposes liability for nonconsensual commercial use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark . . ." when the "use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1)(a). The Act also prohibits unfair competition:

> **(1)** Any person who . . . uses in commerce any word, term, name, symbol, or device . . . which—
>
> > **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, service, or commercial activities . . .
>
> shall be liable in a civil action . . .[.]

15 U.S.C. § 1125.

This is not a counterfeit, imitation, or deception case. Instead, the parties spar over the likelihood that Store Local Media's customers will be confused about the seeming relationship—the "affiliation, connection, or association" between the two companies. 15 U.S.C.

§ 1125(a)(1)(A). The parties agree that the *SquirtCo* factors guide this Court's analysis. These are:

- The strength of Modern Storage's mark;
- The similarity between the marks;
- The competitive proximity of the parties' products and services;
- The degree of care reasonably expected of potential customers;
- The evidence of actual confusion; and
- Store Local Media d/b/a Modern Storage Media's intent to confuse.

*SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

The factors are a framework, not a formula. At the summary judgment stage, they guide the Court in deciding whether a jury could find that Store Local Media's customers would likely be confused about a connection between that media company and Modern Storage's facility business. *Sensient Technologies v. SensoryEffects Flavor*, 613 F.3d 754, 763 (8th Cir. 2010). No factor is dispositive. They are co-dependent—each can affect others. The weight carried by each varies in the circumstances presented. If this law seems amorphous, it's because it is, and is so by design. "This flexible, context specific, and relative-rather-than-mechanical approach makes sense because the general function of the likelihood-of-confusion factors is to guide the finder of fact towards considerations generally thought to be material

to the consuming public's understanding of product source or affiliation. Common sense is inherent in the factors, and the factors, properly applied, should try to capture a holistic view of the normal experiences for any given industry, product, or service. The consumer experience differs by products (buying a toothbrush vs. buying a car vs. professional buyers obtaining input goods for a factory), and the relative importance of any given factor is influenced greatly by how the other factors might apply." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 934 (8th Cir. 2021). To follow this law, the Court will first address each *SquirtCo* factor in turn. Then it will make the holistic analysis required.

The precedent makes another point. Summary judgment is often granted in these kinds of cases. The general law applies, of course. *E.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). But, a factual dispute on one factor doesn't defeat summary judgment unless the dispute is so critical a jury must resolve it. *Duluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996). And when "a trademark dispute centers on the proper interpretation to be given to the facts, rather than on the facts themselves, summary disposition is appropriate." *ZW USA, Inc. v. PWD Systems, LLC*, 889 F.3d 441, 446 (8th Cir. 2018) (quoting *Duluth News-Tribune*).

The parties in this case argue hard about how the facts should be interpreted. But there's no genuine material factual dispute that requires a jury trial.

*

***Strength of the Mark***. There are two measures here: conceptual strength and commercial strength. *Lovely Skin, Inc. v. Ishtar Skin Care Products, LLC*, 745 F.3d 877, 888 (8th Cir. 2014). A distinct mark is conceptually strong. The strongest marks use made-up words or terms unrelated to the owner's product. *Frosty Treats Inc. v. Sony Computer Entertainment America Inc.*, 426 F.3d 1001, 1004–05, (8th Cir. 2005). Think Gatorade, Exxon, or Xerox. Weak marks, on the other hand, use generic or descriptive terms. They describe the quality or characteristics of the product. While recognizing that Modern Storage was general, the Court rejected Store Local Media's argument that Modern Storage was generic as a matter of law and reserved the descriptiveness issue. *Doc. 137 at 2–3.*

"Modern Storage" is descriptive. It describes the quality of the company's storage units. This mark is akin to the sticker on the ice cream truck selling "Frosty Treats." *Frosty Treats Inc.*, 426 F.3d at 1005. "A descriptive mark is the weakest protectable mark." *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005). Modern Storage's mark is conceptually weak. What about commercial strength? It's measured by sales, the length and exclusivity of use, and how the mark's been advertised. *Lovely Skin, Inc.*, 745 F.3d at 888. For example, a bus rental service's slogan "Rent My Party Bus" gained commercial strength in the Twin Cities by displaying the slogan for several years on large

decals on all of its rental buses. *Safeway Transit LLC v. Discount Party Bus, Inc.*, 334 F. Supp. 3d 995, 1000 & 1007 (D. Minn. 13 August 2018). Modern Storage has offered self-storage services in central and northwest Arkansas for almost a decade. *Doc. 56-1 & 56-2*. It saw revenue growth, increased advertising expenses, and opened several new facilities in those years. *Doc. 56-2 & 56-9*. In Arkansas, and a market area reaching into neighboring states, the mark has commercial strength. The company's long-term plan is to franchise. Nationally, though, the mark is commercially weak. In 2024, the national self-storage market was worth an estimated $68.7 billion. *Doc. 101-2*. Modern Storage accounts for a sliver of that booming market. And there's no evidence that Modern Storage's use of the mark has changed the way consumers think of the term "Modern Storage." No survey results, for example, show that the term now calls Modern Storage's technology-enhanced facilities to many minds.

***Similarity Between the Marks***. The closer the resemblance, the more likely a consumer will be confused. *Davis*, 430 F.3d at 903. Similarity is based on a mark's overall impression: the sight, sound, and meaning of each mark. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987). It turns on how the marks are presented to customers as they use the product or service.

The dominant portion of Store Local Media's mark, "Modern Storage Media" is textually identical to Modern Storage's mark. The

parties agree "Media" is a generic term. Its addition does little to distinguish the mark. There are differences, though, in the overall impression made by each mark. Modern Storage's mark is spelled out in all-caps, in a red-and-white color scheme. But the Modern Storage Media mark is often shortened to "MSM" or just "M"—both with the distinctive turned-down corner, suggesting a marked page. Its magazine still uses the old "MESSENGER" mark on its cover, again with the turned-down corner. *Doc. 56-16.* In some forms, the mark is spelled out below the acronym. It mostly uses red-and-white, too. Visitors to the media company's website go to www.modernstoragemedia.com. In sum, the similarities between the presentations of each mark outweigh the differences.




***Competitive Proximity***. How do the parties' services compete? *A.I.G. Agency v. American International Group*, 33 F.4th 1031, 1037 (8th Cir. 2022). Modern Storage Media's print and online publications don't compete with Modern Storage's self-storage units. Direct competition, though, isn't required. *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005). In *Kemp*, one company sold packaged rice, while another sold processed fish products—each under very similar marks.

*Ibid.* The products didn't directly compete, but because the products were food-related, consumers might think they were connected. *Ibid.* Here, the self-storage units and the media publications don't compete. But they are all storage-related. A consumer might think Modern Storage Media's content is associated with Modern Storage.

***Degree of Care.*** The Court must consider how much attention "the ordinary purchaser" would give when "buying under the normally prevalent conditions of the market." *Sensient Technologies*, 613 F.3d at 769. The parties serve different customers. Store Local Media sells subscriptions to those in the self-storage business. And it sells advertising space to those businesses and their owners. It also sells advertising to various companies that do business with these folks, such as vendors that supply garage doors for rental units, HVAC systems, facility insurance, and security systems. Modern Storage, on the other hand, rents storage units to the general public.

The ordinary Modern Storage customer pays some attention to the source of the product. Location is often a driving factor. Renting a typical unit each month is relatively inexpensive, but over several months the cost can add up. Plus, the customer is entrusting property to the storage facility's care. The ordinary customer will seek a conveniently located storage unit with proper security, good access, and climate protection.

Store Local Media's consumers take even greater care. They're mostly professional consumers. A business subscribing to a trade magazine should know the product and where it comes from. *Duluth News-Tribune*, 84 F.3d at 1099. Similar to *Duluth News-Tribune*, while a monthly subscription to a newspaper or magazine isn't a major purchase, an ordinary purchaser knows which paper or magazine they are buying. *Ibid.* Even more so, an advertiser buying space in that magazine will take care to know the product and its publisher before spending thousands of dollars.

In this case, it's the ordinary Store Local Media consumer that is key. Modern Storage says Store Local Media consumers might be confused about to the source or affiliation of Modern Storage Media's publications. The consumer could wonder, at least at first, "Is *Messenger* magazine published by Modern Storage?" But the typical Store Local Media consumer would know otherwise or explore further.

***Actual Confusion***. Modern Storage offers several examples of confusion—mostly on social media in "mis-tags." The examples follow this pattern: A fellow self-storage entrepreneur goes on LinkedIn or Instagram to share an article from Store Local Media's magazine. The post should tag (embed a hyperlink to) Modern Storage *Media*'s LinkedIn/Instagram profile. It instead tags Modern Storage. This has happened fourteen times in about three years. *Doc. 57 at 21; Doc. 140.* StorSafe Self Storage and its CEO, Tom Bretz, account for four of the

mis-tags. *Doc. 56-27; Doc. 56-28; Doc. 56-42 & Doc. 56-41.* TractIQ and Downtown Self Storage are also repeat mis-taggers. *Doc. 56-35 & Doc. 140-2* (TractIQ); *Doc. 140-3 & Doc. 140-4* (Downtown Self Storage).

The Court appreciates the parties' post-hearing authorities on social media tagging, *Doc. 145 & 146*. Modern Storage says the mis-tags prove actual confusion. *See, e.g., White Hall Pharmacy LLC v. Doctor's Orders RX Inc.*, 2019 WL 3939357 (E.D. Ark. 20 August 2019); *Baron App, Inc. v. OpenAI, Inc.*, 820 F. Supp. 3d 881 (N.D. Cal. 14 February 2026). Store Local Media responds that the posters aren't confused, just inattentive. What strikes the Court about the other cases is that mis-tagging was a small part of a larger record of confusion. In *White Hall*, a Pine Bluff pharmacy was inundated with phone calls, messages, and in-person questions from customers after a marijuana dispensary opened in Hot Springs under the same name. 2019 WL 3939357 at *16–18. A mistaken Facebook tag was one part of the Court's preliminary injunction record on actual confusion. In *Baron App*, the mis-tags were part of an evidentiary record that included a consumer survey. 820 F. Supp. 3d at 899. Here, mis-tagging is the core of Modern Storage's argument. That's novel.

Modern Storage offers one other confusion instance. After the summary judgment briefing and hearing, the parties attended a storage convention in Las Vegas. *Doc. 147*. Modern Storage employees say one attendee asked about an event the company was hosting, but it was

actually Modern Storage Media that was the event's host. *Doc. 147-1 at 3.* Two other attendees mixed up the companies' booths. They thought Modern Storage had two booths at the convention. *Doc. 147-1 at 4–5.*

The social media mis-tagging and trade show mix-ups don't create a jury issue. "Even several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion." *Duluth News-Tribune*, 84 F.3d at 1098. A material dispute about actual confusion only exists when "an appreciable number of ordinary purchasers" are likely to be confused. *Duluth News-Tribune*, 84 F.3d at 1099. *Compare, e.g., Duluth News-Tribune*, 84 F.3d at 1098 (a letter from a reader offering plaintiff-newspaper edits to an article in defendants' newspaper didn't create a jury issue); *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1246 n.3 (8th Cir. 1990) (six instances of actual confusion insufficient to establish a genuine issue of material fact); *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207–08 (1st Cir. 1983) (temporary confusion about an association between the parties was insufficient); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3rd Cir. 1978) (nineteen misdirected letters in four years didn't create a likelihood of confusion). Several of the nine mis-taggers were deposed. They said this was mostly inattention and hurry, with a bit of confusion. Whether these individuals were confused or not, this

record presents insufficient evidence of actual confusion among Modern Storage Media's ordinary purchasers.

***Intent to Confuse***. Here Modern Storage points to Store Local Media's failure to correct the fourteen mis-tags on LinkedIn and Instagram. Intent at the time the alleged infringing mark is adopted is relevant. Failing to take reasonable steps after adoption to minimize the risk of confusion can also show intent. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 22, comment c. (1995). But to expect Store Local Media, or any business, to police the internet isn't reasonable. Store Local Media hasn't received any misdirected calls, mail, or other communications. Not promptly correcting that kind of confused direct contact would be evidence of an intent to confuse. While Store Local Media said it couldn't justify the expense of devoting employee time to correcting mis-tags, it said of course it would redirect any misdirected communications.

The evidence points to a more innocent explanation of Store Local Media's intent. In 2023, it bought an existing trade magazine called the "**M**ini-**S**torage **M**essenger." The magazine became part of Store Local Media's "**M**odern **S**torage **M**edia" publications. Store Local Media intended to rebrand while keeping the MSM shorthand.

*

Some of the *SquirtCo* factors could be interpreted different ways. Viewed holistically, however, there isn't a likelihood of confusion

between the two marks. *Select Comfort Corp.*, 996 F.3d at 934. "Modern Storage" is a very weak mark. If the other factors strongly favored a likelihood of confusion the mark would be entitled to the law's protection. For example, a competitor operating new self-storage facilities under the name "Modern Storage", or something very similar, would almost certainly be an infringer. That's not our case. There's no evidence Store Local Media intended to pass off its media publications as products of Modern Storage. The magazines and online articles published by Modern Storage Media don't directly compete with Modern Storage's self-storage units. The storage connection could cause Store Local Media consumers to assume, at least initially, some association with Modern Storage. But an advertiser or subscriber flipping through the *Messenger* would see advertisements for Modern Storage's competitors. The same is true for visitors scrolling through www.modernstoragemedia.com. Store Local Media's use of the mark to promote Modern Storage's competitors makes affiliation unlikely. *Davis*, 430 F.3d at 905.

The developed record shows, at most, casual confusion: scattered social media mis-tags and isolated cases of mistaken identity by some other storage professionals. It's a result of storage professionals being only slightly—or newly—aware of both Modern Storage and Modern Storage Media. It occurs on social media when users choose to tag either "Modern Storage" or "Modern Storage Media." The degree of

care those consumers use when they subscribe or buy advertising space mitigates this kind of passing confusion. Subscribers are discerning about the source of their chosen publications. And advertisers are likely to be quite clear about to whom they're paying thousands of dollars to spread the word about their storage-related products. These superficial cases of misunderstanding, inattention, or ambiguity don't indicate that consumers are actually confused.

The "core element" of trademark law is whether an infringer's use of a mark "creates a likelihood that the consuming public will be confused as to who makes what product." *Ibid.* The Lanham Act specifically prohibits unauthorized commercial use of a mark likely to cause confusion of "affiliation, connection, or association[.]" 15 U.S.C. § 1125(a)(1)(A). Store Local Media's use of the Modern Storage Media mark doesn't create that kind of confusion. Some initial fuzziness is the hardly surprising outcome of the circumstances as a whole: a company with a weak, descriptive mark such as "Modern Storage", doing business in an internet age where hurry is the norm, in the large and growing self-storage industry.

*

Store Local Media is entitled to summary judgment on all Modern Storage's trademark infringement and unfair competition claims. Modern Storage's motions for summary judgment, *Doc. 56 & 59*, are

denied. Store Local Media's motion for summary judgment, *Doc. 74,* is granted.

So Ordered.

D.P. Marshall Jr.
United States District Judge

30 September 2026